CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

AUG 04 2006

JOHN F. CORCORAN, CLERK
BY: /s/ DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| JULIAN D. JOHNSON,<br><br>*Plaintiff,*<br><br>v.<br><br>JO ANNE B. BARNHART, COMMISSIONER OF SOCIAL SECURITY,<br><br>*Defendant.* | CIVIL ACTION NO. 3:05-CV-00046<br><br><br>MEMORANDUM OPINION<br><br><br>JUDGE NORMAN K. MOON |

This case was referred to the Honorable B. Waugh Crigler, United States Magistrate Judge, for proposed findings of fact and a recommended disposition of the parties' cross-motions for summary judgment. The Magistrate filed his report on May 30, 2006, recommending that this Court enter an Order denying the Commissioner's motion for summary judgment, granting Plaintiff Julian Johnson's motion for summary judgment, reversing the Commissioner's final decision, entering judgment for Johnson, and recommitting the case to the Commissioner solely to calculate and pay proper benefits.

The Commissioner filed objections to the Magistrate's report on June 8, 2006, thus obligating the Court to review *de novo* those portions of the report to which objections were made. 28 U.S.C.A. § 636(b)(1).

## I. BACKGROUND

On August 20, 2003, Johnson, who was 36 years old at the time and had past relevant

1

work as a fork lift operator, general laborer, and cleaner/janitor, filed a claim for a period of disability and disability insurance benefits under the Social Security Act, as amended, 42 U.S.C. §§ 416 and 423. After his claim was denied initially and on reconsideration, he requested a hearing before an administrative law judge (ALJ), which was held on March 31, 2005. Johnson testified at the hearing and amended his alleged onset date of disability to November 1, 2003. Gerald Wells, Ph.D., testified as a qualified vocational expert (VE).

On April 25, 2005, the ALJ issued a decision denying benefits. Applying the five-step sequential evaluation process prescribed by Social Security Administration regulations,[1] he first found that Johnson was not performing substantial gainful work as of the time of the alleged onset date. (R. 16). After a lengthy summary of the medical evidence, he found the following of Johnson's impairments to be "collectively" severe:

> [S]tatus post head injuries (February 1, 2001 and December 2002); degenerative disc and bone disease of the cervical and lumbar spine; obesity; headaches; an anxiety disorder; an adjustment disorder with depressed mood; a cognitive disorder, NOS; and prescription medication dependence.

(R. 20). None of these impairments individually or in combination, however, were deemed sufficient to meet the criteria set forth in the Medical Listings. *Id.*

The ALJ next assessed Johnson's residual functional capacity (RFC). Weighing the physician opinion evidence that addressed the effect of Johnson's cognitive and psychological limitations on his ability to work, he rejected the Mental Limitations Assessment of Dr. David Leen and credited those of Dr. Sulaiha Mastan and Dr. Mary Cronin. (R. 21). He also considered the effect of headache-related pain on Johnson's ability to work, and found "not fully

---

[1] *See* 20 C.F.R. § 404.1520.

2

credible" Johnson's testimony concerning the frequency and severity of his headaches. (R. 21, R. 369-71). The ALJ concluded that Johnson retains the RFC to perform light work[2] that involves no detailed instructions, no extended periods of concentration, only occasional interaction with supervisors, occasional interaction with coworkers, occasional interaction with the general public, and occasional changes in work setting or procedure. (R. 22).

Dr. Wells testified that someone with this RFC would not be able to perform Johnson's past relevant work, but that a substantial number of jobs exist in the national economy and the state of Virginia for someone with Johnson's limitations, including jobs as a car detailer, a janitor/cleaner, and a restaurant bus person. (R. 376-78). Relying on Dr. Wells' testimony, the ALJ concluded that Johnson is not disabled, and his decision denying benefits became the final decision of the Commissioner when the Appeals Council declined review. (R. 5).

On September 23, 2005, Johnson timely filed a complaint in this Court seeking review of the Commissioner's decision. In his summary judgment motion, he urges reversal arguing that the ALJ (1) did not properly evaluate the medical evidence concerning his mental health and other limitations; (2) improperly disregarded the VE's testimony concerning his nonexertional impairments; and (3) did not evaluate his credibility in accordance with applicable regulations. The Commissioner responded in its own summary judgment to each of these arguments and urged that the decision denying benefits be affirmed.

---

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. §404.1567(b).

3

Magistrate Judge Crigler agreed with Johnson's first argument, finding that the "Commissioner has failed to put forth psychological evidence to refute Leen's opinion that plaintiff's psychological conditions preclude him from performing any substantial gainful activity." Without addressing Johnson's other arguments, Judge Crigler recommended reversal of the Commissioner's decision. (R&R p. 3-4).

The Commissioner filed objections within the 10-day period prescribed by 28 U.S.C. §636(b)(1), renewing all of the arguments set forth in her motion for summary judgment and stating that Judge Crigler ignored two medical expert reports constituting substantial evidence that refute Dr. Leen's opinion. Thus, the Court is obligated to review all of the issues raised on summary judgment, which include whether the ALJ properly evaluated the medical opinion evidence, the vocational expert testimony, and Johnson's credibility.

## II. STANDARD OF REVIEW

A district court's primary function in reviewing an administrative finding of no disability is to determine whether the Commissioner's factual findings are supported by substantial evidence and were made in accordance with applicable law. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987); 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). It "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1990). However, a claim that the Commissioner improperly applied legal standards in making factual findings is reviewed *de novo*. *Hines v. Bowen*, 872 F.2d 56, 58 (4th Cir. 1989); *Myers v. Califano*, 611 F.2d

4

980, 982 (4th Cir. 1980).

An ALJ has a "duty of explanation" to "refer specifically to the evidence informing [his] conclusion[s]." *See Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985). Reviewing courts have a corresponding obligation "to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974); *Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977).

### III. DISCUSSION

**A. The ALJ followed applicable law and regulations concerning the evaluation of medical opinion evidence, and his findings are supported by substantial evidence**

Medical opinion evidence is used to determine the nature and severity of a claimant's impairments, including his symptoms, diagnosis and prognosis, what he can still do despite his impairment(s), and his physical or mental restrictions. 20 C.F.R. § 404.1527(a)(2). Every medical opinion received must be evaluated, and applicable regulations specify how they are to be weighed. 20 C.F.R. § 404.1527(d). Generally, more weight is given to examining than to non-examining sources. 20 C.F.R. § 404.1527(d)(1). The more an opinion is supported by reasoning and relevant evidence, and considers all of the evidence pertinent to a claim, the more weight it is given. 20 C.F.R. § 404.1527(d)(3). The more consistent an opinion is with the record as a whole, the more weight it is given. 20 C.F.R. § 404.1527(d)(4). The opinions of specialists are preferred over those of nonspecialists. 20 C.F.R. § 404.1527(d)(5). Any other factors tending to support or contradict an opinion may be considered. 20 C.F.R. §404.1527(d)(6).

An ALJ may choose to give less weight to a medical opinion when there is "persuasive

5

contrary evidence." *Maestro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001) (citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). "If a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Maestro*, 270 F.3d at 178 (citing *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996)). An ALJ may rely on the opinions of non-examining physicians if they are consistent with the record. *See Smith v. Schweiker*, 795 F.2d 343, 245-46 (4th Cir. 1986).

The record contains three physicians opinions addressing the nature and extent of Johnson's mental limitations, and their effect on his RFC. Dr. Leen, a clinical psychologist, conducted a psychiatric interview and a "Mental Status Examination" of Johnson on November 6, 2003, and issued written findings on November 8, 2003. (R. 269-72). Solely on the basis of this examination and report, Dr. Leen completed a Mental Limitations Assessment form dated March 8, 2005, finding that Johnson has "marked" impairment in three subcategories and moderate impairment in one subcategory within the "ability to sustain concentration and attention" category; "marked" impairment in three subcategories within the "reliability" category; and "marked" impairment in three subcategories and slight to moderate impairment in one subcategory within the "social interaction" category. (R. 353-54). Dr. Leen noted "insufficient evidence" to make findings with respect to six subcategories.

In December 2003, two non-examining DDS medical disability examiners, Drs. Cronin and Mastan, also clinical psychologists, completed mental RFC assessments based on their review of the medical record then existing. (R. 273-91). Both found that Johnson is moderately limited in his ability to understand and remember detailed instructions and to maintain

6

concentration for extended periods;[3] moderately limited in his ability to work in concentration with or proximity to others without being distracted by them,[4] not significantly limited in his ability to complete a normal workday and workweek without psychologically-based interruptions or to perform at a consistent pace;[5] and moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers without distracting them or exhibiting behavioral extremes, and to respond appropriately to work setting changes.[6] *Id.*

The ALJ offered several reasons for his decision to give "reduced weight" to Dr. Leen's opinion. Substantial evidence supports his view that Johnson's allegations of poor concentration and inability to deal with others are inconsistent with Dr. Leen's own observations. In his November 2003 report, Dr. Leen observed Johnson "to be completely oriented and in good contact with the examiner" and "able to concentrate and persist adequately enough to complete this examination"; found his thought processes to be "concrete, mildly to moderately tangential and preoccupied with his injuries and related functional losses, and grossly logical"; and reported that he "appeared to be a reliable historian during the current examination" (R. 269-71). Yet based on Johnson's self-reported limitations alone, Leen later found Johnson to have one moderate and three marked impairments within the "ability to sustain concentration and

---

[3] Dr. Leen made no findings as to Johnson's limitations in these subcategories.

[4] Dr. Leen found Johnson to be markedly limited in this subcategory. (R. 353).

[5] Although the assessment forms use difference language, Dr. Leen found Johnson to be markedly limited in his ability to maintain regular full-time work attendance and to tolerate ordinary work stresses without deterioration within an 8-hour day. (R. 354).

[6] Dr. Leen found marked limitations in these subcategories.

7

attention" category, and one slight to moderate and three marked impairments within the "social interaction" category. (R. 353-54). Dr. Cronin and Dr. Mastan both cited these inconsistencies between Leen's observations and his later conclusions as one of the grounds for their differing assessments of Johnson's mental RFC. (R. 289, 291).

As another ground to assign Dr. Leen's opinion little weight, the ALJ cited Johnson's relatively meager mental health treatment. Since his alleged onset date of November 1, 2003, Johnson has been repeatedly referred for psychiatric care and counseling (R. 315, 329, 331, 337), and counselors at the Family Stress Clinic at the University of Virginia have tried to follow up on his complaints. (R. 313). However, no evidence of record shows that Johnson pursued such treatment. An individual's statements "may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." Soc. Sec. Ruling 96-7p at 7.[7] Dr. Leen explicitly stated in his March 2005 report that his conclusions were based solely on his November 2003 interview with Johnson, (R. 354), and thus, unlike the ALJ, he could not have evaluated the credibility of Johnson's allegations in light of all the relevant medical evidence, which revealed his limited treatment history. The extent to which an opinion considers all of the evidence relevant to a claim and is consistent with the

---

[7] Johnson testified at the hearing that he did not see a UVA counselor because his insurance provider would not pay for it. (R. 369). "[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide," such as an inability "to afford treatment" and lack of "access to free or low-cost medical services." SSR 96-7P, at 7-8. However, Johnson also indicated that his insurance covered his treatment by a non-UVA psychiatrist, Dr. Brown, in the past, (R. 369; see R. 96, 136, 146, 270 (self-reporting that he saw Dr. Brown "on at least 20 occasions")), and offered no explanation why he did not pursue treatment with a covered provider.

8

record as a whole are both factors to be considered in weighing physician opinion evidence. 20 C.F.R. §§ 404.1527(d)(3), (d)(4). The ALJ's characterization of Johnson's treatment history is supported by substantial evidence, and was properly cited as a factor in his decision to accord Dr. Leen's opinion little weight.

Although Dr. Leen noted that he had insufficient information to make findings concerning Johnson's memory, and the ALJ himself found that Johnson's memory and cognitive problems disable him from any work involving detailed instructions, the ALJ did not err in giving his observation that Johnson's memory appeared adequate at the hearing as another reason to discount Leen's opinion. When asked about his memory at the hearing, Johnson reported that it's "[b]ad. I can't hardly remember what I did yesterday. I mean, it comes and goes. It's bad." (R. 371). However, Johnson responded without apparent difficulty to questions about his family and living situation, his work history, the prescription drugs he was taking and the physicians he saw. (R. 361-62; 367-69; 371-73).

"Although an ALJ may not rely solely on his personal observations to discredit a plaintiff's allegations, he may consider his own assessment of plaintiff's behavior and demeanor during the hearing as part of his credibility determination." *Rebeck v. Barnhart*, 317 F. Supp. 2d 1263, 1274 (D. Kan. 2004); *see* Soc. Sec. Ruling 96-7p ("In instances in which the adjudicator has observed the individual, the adjudicator is not free to accept or reject the individual's complaints solely on the basis of such personal observations, but should consider any personal observations in the overall evaluation of the credibility of the individual's statements.").

The ALJ did not rely solely on his perception that Johnson's hearing testimony and allegations were inconsistent; he also noted that Johnson's "allegation of forgetfulness has not

9

warranted formal cognitive testing by treating physicians."[8] (R. 22). Indeed, Johnson's neurologist, Dr. Login, terminated their relationship after expressing that he had nothing to offer Johnson in the way of treatment within his area of expertise. (R. 135-37). During an April 2004 exam a neurologist at the University of Virginia observed that Johnson "is able to provide fine details about his medical history . . . . He remembers all current events and precise dates that are pertinent to his history and remembers numerous MD's last names that were involved in his care." (R. 333-34). She concluded that the neurological exam was normal. (R. 334).

As the ALJ had sufficient foundation to believe that Johnson exaggerated his memory loss at the hearing, he could properly infer that Johnson has exaggerated his other problems in other contexts. In conducting a psychological evaluation of Johnson, Dr. Leen administered a "psychiatric interview with Medical Status Examination." (R. 269). The report generated from that evaluation references no medical records or tests, and Dr. Leen apparently relied exclusively on Johnson's self-reported, subjective complaints.[9] Later, in making his findings concerning Johnson's mental RFC, Dr. Leen explicitly stated that he relied solely on this report. To the extent the Leen's report is only as reliable as Johnson is credible, and did not benefit from a complete review of the medical record, the ALJ acted rationally in discounting it.

The ALJ adopted the mental RFC reports of Drs. Cronin and Mastan, finding them

---

[8] In a May 2003 report, Dr. Hong, a specialist in internal medicine, summarized a "UVA neuropsych report from Dr. Freeman 2/19/02" which indicates that Johnson's intelligence, memory, motor speed, and attention skills were tested. (R. 163). However, Dr. Freeman was not listed by Johnson as among his many physicians, (R. 81-82, 86-87), and his report is not part of the record.

[9] (R. 270 ("No evidence was found currently or in his history as he related it at the time of the current examination of panic disorder, obsessive-compulsive disorder, mania or overt psychosis.")).
10

consistent with the record as a whole. (R. 22, 273-91). Substantial evidence supports this finding, *see* (R. 135-37; 163-66; 273-91; 333-34), and his reliance on their reports was lawful. *See* 20 C.F.R. § 404.1527(f)(2)(i) (although ALJs are not bound by their findings, "State agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation."); *Smith v. Schweiker*, 795 F.2d 343, 345-46 (4th Cir. 1986) (holding that the Commissioner may rely upon the opinions of such non-examining medical experts when they are consistent with the record).

In sum, although some of the ALJ's analysis in weighing the medical opinions is flawed,[10] his crucial finding—that the opinions of Drs. Mastan and Cronin are more consistent with the record and should be given greater weight than Dr. Leen's—is lawful, rational, and supported by substantial evidence. Although a close question, the Court finds that any error

---

[10] As another reason for discounting Dr. Leen's opinion, the ALJ found Leen's conclusion that Johnson cannot manage his own funds or perform simple, unskilled tasks to be inconsistent with evidence that Johnson "does manage his own funds and routinely performs simple unskilled tasks." However, the ALJ failed to point to—nor does the record appear to contain—any evidence supporting the latter finding. Showering and driving his sister to errands a couple times per week (*see* R. 91-108, 366) do not reasonably qualify as routine performance of unskilled tasks, such as would be comparable to the type of daily performance expected in the workplace.
 The ALJ also notes that Johnson's disability claims primarily focus on physical, not cognitive or psychological, limitations, and that he has never been diagnosed with psychosis. These factors are of limited, if any, relevance. The ALJ himself found the combination of Johnson's mental and physical limitations to be "severe" within the meaning of the regulations, and the presence of psychosis is not a prerequisite to a finding of mental disability.
 Last, the ALJ notes that Johnson saw Dr. Leen when his unemployment benefits had just expired and while he was pursuing a worker's compensation claim, "facts which might provide both unusual temporary stress and motivation to exaggerate." (R. 22). As Johnson rightly points out, all claimants seeking benefits have a motivation to exaggerate, and without more, speculation of this kind is unwarranted. *See Reinertson v. Barnhart*, 127 Fed. Appx. 285, 288 (9th Cir. 2005) (unpublished).

attributable to the ALJ's wrong impression of Johnson's daily activities or reliance on irrelevant factors was harmless, and that a remand is not necessary. *See Ngarurih v. Ashcroft*, 371 F.3d 182, 190 n. 8 (4th Cir. 2004) ( "While the general rule is that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained, reversal is not required where the alleged error clearly had no bearing on the procedure used or the substance of the decision reached.").

Johnson also urges that the ALJ erred by failing to assess the opinions of his treating physicians in accordance with the law or to identify the weight he ultimately accorded them.

This argument has no merit. Although the record reflects that Johnson's treating physicians apparently credited his allegations of headaches, neck and back pain, and depression, Johnson fails to point to any document in which a treating physician offered an opinion as to the effect these conditions had on his functional capacity.

**B. The ALJ did not improperly ignore the vocational expert's testimony**

Johnson claims the ALJ erred by ignoring the VE's testimony that a person whose psychological condition "prohibit[s] all social interaction" and renders them "unable to maintain reliable attendance at work" would be unable to perform work that exists in significant numbers in the national competitive economy. (P. MSJ at 18); (R. 379-80). The VE so testified in response to a hypothetical question posed by Johnson's counsel.

This argument rests on an erroneous premise, presupposing that Johnson actually possesses the hypothetical limitations. As already noted, the ALJ found him capable of occasional interaction with supervisors, occasional interaction with coworkers, and occasional interaction with the general public. He made no findings concerning Johnson's ability to attend

12

work regularly, which is consistent with his adoption of the RFC assessments of Drs. Cronin and Mastan, who opined that Johnson's ability to maintain regular attendance and be punctual within customary tolerances was not significantly limited. (R. 287). The Court has already found that the ALJ's mental RFC findings were made lawfully and are supported by substantial evidence.

### C. The ALJ properly evaluated Johnson's credibility in connection with his complaints of headaches, neck, and back pain

In determining the credibility of an individual's statements about pain or other symptom(s) and its functional effects, the adjudicator "must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." Soc. Sec. Ruling 96-7p at 1; *see* 20 C.F.R. §§ 404.1529, 416.929. Because a claimant's symptoms may suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, when assessing the credibility of an individual's statements the adjudicator must, in addition to the objective medical evidence, consider:

 1. The individual's daily activities;
 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
 3. Factors that precipitate and aggravate the symptoms;
 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms . . . ; and
 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Soc. Sec. Ruling 96-7p at 3; *see* 20 C.F.R. §§ 404.1529(c), 416.929(c).

13

In analyzing the credibility of Johnson's statements about pain and its effects on his ability to function, the ALJ accurately summarized Johnson's hearing testimony that severe headaches occurring two to three times a week require him to lie down in a dark room, impair his memory, and make him nauseated, irritable, unable to be around people, and unable to concentrate enough to watch television. (R. 369-70). The ALJ then followed Fourth Circuit law and social security regulations by first determining that the objective medical evidence showed abnormalities that could reasonably be expected to produce symptoms "of the general type described." (R. 21); see Craig v. Chater, 76 F.3d 585, 594-95 (4th Cir. 1996); 20 C.F.R. §§ 416.929(b) & 404.1529(b). However, he found Johnson's allegations "not fully credible," noting that Johnson's daily activities and non-aggressive treatment history were inconsistent with his testimony; that the record reflected apparent narcotic-seeking behavior; and that a treating physician had advised Johnson that his headaches are "rebound" headaches caused by the narcotic pain medication he was continuing to take against physician advice.

Substantial evidence supports most of the ALJ's findings. Johnson did testify that his wife drops his children off about two to three times per day without adding any qualification that his headaches interfere with these visits.[11] R. (371-72). Though he visited the hospital twenty

---

[11] The ALJ also noted that Johnson performs selective household chores, and highlighted that Johnson drives his sister to the store a couple times per week.
The record does not reflect that Johnson performs household chores, and driving his sister to the store is of little, if any relevance, as it is not inconsistent with headaches of the frequency described. Cf. Trotten v. Califano, 624 F.2d 10, 11-12 (4th Cir.1980) ("An individual does not have to be totally helpless or bedridden in order to be found disabled under the Social Security Act, otherwise, the ability to perform substantial gainful activity even one day each month or each year would disqualify an individual for benefits."). Despite these problems, the Court finds that any error was harmless.

14

times complaining of headache pain after his initial fall and before his alleged onset date of November 1, 2003,[12] during which period he worked or had applied for or was receiving unemployment benefits,[13] (R. 69, 359), he has made only four trips to the emergency room after his alleged onset date. (R. 321, 339, 349-50). Thus, Johnson's treatment history suggests that his symptoms were no more severe, and quite possibly less severe, during his period of alleged disability than they were during the period that he continued to work or held himself out as ready and able to work. The lack of aggressive treatment for the allegedly crippling headaches might be explained by his physicians' observations that despite reporting severe pain (either 6, 7, or 9 out of a scale of 10), he was in no apparent distress. (R. 329, 343, 347).

Although the ALJ made a serious charge in stating that Johnson's desire to obtain narcotic drugs provided a motive for exaggerating his symptoms, it is supported by substantial evidence. A state physician who completed a physical RFC assessment of Johnson reviewed his medical records and concluded that they "indicate probable drug seeking behavior." (R. 297). This conclusion is supported by medical records indicating that Johnson had "not tried" and "failed" non-narcotic pain regimens,[14] that he repeatedly requested and expressed a preference for Percocet,[15] and that his physicians recommended that he stop taking or questioned his ongoing

---

[12] (R. 142-45, 168-268).

[13] To complete an application for unemployment benefits, Johnson would have had to declare himself able and available for work with no undue restrictions on his ability to work. Va. Code Ann. § 60.2-612(7)(a); *Unemployment Comp. Comm'n v. Tomko*, 65 S.E.2d 524 (Va. 1951).

[14] (R. 337-38).

[15] (R. 322; 324 ("Dr. Hamza's note does not recommend narcotics as the long-term solution for his pain. However, patient states that he did not get along with that doctor and that

15

use of Percocet.[16]

The ALJ also correctly noted that Johnson was informed that he was likely suffering from "rebound" headaches caused by taking pain medications continuously. Dr. Nipkey explained the concept to him in April 2003, but when she advised him to cut back and try non-prescription Alleve, "He was reluctant to accept this advise [sic] from me." (R. 307-08). Another discussion of rebound headaches ensued in August 2003, (R. 302), but the record reflects only that Dr. Nipkey terminated her relationship with Johnson in October 2003, (R. 300), and that Johnson thereafter actively pursued treatment with prescription medications.[17] The record thus permits an inference that Johnson brought his headaches upon himself by failing to follow physician advice, which tends to undermine his credibility and claim for disability.

Another factor relied upon to discount Johnson's pain allegations were his statements that Percocet relieved his headache symptoms, which is incongruous with the ALJ's concomitant citing of Johnson's desire for narcotic medication against him. Although the ALJ's reliance on both factors in the same discussion was not rational, it was harmless error in light of the evidence

---

the only medicine that works currently are the Percocets."); 327 ("He does say that the Percocet is the only medicine that seems to help his headaches. He believes that about two Percocet twice a day would help his pain"); R. 329 (reporting that Johnson said "the only thing that can help him is Percocet"); 331; 337)

[16] (R. 313; 324-25, ("If the patient does not follow up with [a new primary care physician], we will not refill his narcotics'); 327; 329 ("Since our last visit, he has seen Neurology and also Pain Management, and both have said that chronic opiode would not benefit his long term treatment"); 331).

[17] A different physician noted in November 2004 that "[p]atient's headaches are likely rebound headaches from all his pain medication use . . . . I would like to get a second opinion from neurology concerning possibility of rebound headaches and assistance with weaning him off his pain medications." (R. 313).

16

that Johnson's headaches also would have been alleviated had he followed Dr. Nipkey's advice.

In accordance with the regulations, the ALJ evaluated many factors supporting his decision not to credit Johnson's testimony. His findings are supported by substantial evidence, and any error in his reasoning, which largely was rational, was harmless.

## IV. CONCLUSION

After a thorough examination of the documented record and the applicable law, the Court concludes that the decision of the Commissioner should be affirmed. The Court will not adopt the Report and Recommendation of the Magistrate Judge, and will deny Johnson's motion for summary judgment, grant the Commissioner's motion for summary judgment, and affirm the Commissioner's decision in an order to follow.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion and Order to all counsel of record.

ENTERED: _/s/_ _____
U.S. District Judge

August 4, 2006
Date